210-1232 City of Aurora v. Lucey Park May it please the Court, Mark Matranga for the City of Aurora Appellant. We're here before the Court to ask the Court to enforce or reinforce what we consider to be basic workers' compensation law, which is that not everything that happens at work is compensable. This case involves an injury to this police officer who's described by her physician as heavyset, elsewhere in the records as 260 pounds, who, while exiting her vehicle at the beginning of the day, this was at the police department, on the police department's premises, of course, but she was not yet started, she had not yet started her shift. When she put her weight onto her left knee, she felt pain and subsequently was found to have chondromalacia, underwent surgical procedures. City of Aurora submits. Dr. Cole said two things. One, the absence of pre-existing symptoms and the, quote, mechanism of injury, unquote, made the injury work related. But his records, when he first saw the petitioner and had a knee survey, I cannot represent to the Court that the petitioner filled this out versus the doctor, but the knee survey portion of Dr. Cole's records from January 2007 stated that she was at work, getting out of the squad car, heard pop in the left knee. Now, later on, there's testimony about twisting the knee. I suspect after she felt the pop and the pain, she may have twisted the knee, but that's not what's crucial for this case. We have other cases getting up out of chairs, Board of Trustees. We have cases getting up from a small preschool chair. I don't know if any members of this Court ever attended the types of things I did at one time where we have the preschool parent-teacher conferences and we sit on these very low things. I've still been used that the claimant did not prevail in Hansel and Gretel, but she did not, arising from that small chair. It's not a very normal chair for people, and she blew out her knee. Granted, she had a pre-existing problem. But nonetheless, Hansel and Gretel, getting up from, Board of Trustees getting up out of, and then the Margaretville case, getting out of an automobile which was wrenched in between – there was an 8-inch gap between Clarence Carr and – Those cases affirm the claimant, or what they do is – I cannot recall, Your Honor. I would not want to represent that they affirmed the commission or that they reversed. I'm sorry. But the basic proposition, again, is that not everything that happens at work is compensable. Exiting a vehicle in the Margaretville case where the testimony is pretty specific, the woman had to squeeze 8 inches is not very much. We've all had to do that. And in so doing, she twisted her knee. It's very plausible. We can visualize this. Her claim was denied because the act of exiting the vehicle was a normal type of activity. Your point is well taken. I mean, we all recognize, and there's dozens of cases, that not every accident that happens at work is going to be compensable. Okay? But you've got the arbitrator viewing the claimant specifically. Something unusual here in full gear, full work gear, taking into consideration the weight of the gun belt, the accessories, all of those things, and the commission found there was a causal connection between the claimant's work and the injury. And we know the appropriate test is there some evidence in the record to support the commission's decision. They weigh the evidence. It's conflicting. Tell us why there is no evidence in the record to support the commission's decision. Cutting right to the chase. Very well, Your Honor. With regard to the gun belt and the vest, there's no claim. Petitioner didn't claim that those caused her injury. But didn't she say it made it more difficult getting in and out of the squad car? Isn't there evidence in the record that it made it more difficult? She may have said that. I agree. But the question is, does that make a causal nexus between what happened to her? And the answer is no. The basic physics of exiting a vehicle, whether one has a vest on or not, whether one has this belt on, just for whatever it may be worth, the testimony was that it was 30 pounds. I think there are several cases that are in the record here where other police officers were wearing 9 and 10 pounds. But we'll just put that hyperbole out for the moment. When you say getting out of a car with a full gun belt and a bulletproof vest, is the same thing as getting out of a car without it? It's possible, Your Honor, that it may be under certain circumstances. But there's no claim here by the petitioner that it was. After all, there are five histories given to the emergency room, Rush Copley, Dr. Angel, the therapist, Dr. Player, and Dr. Cole. They all say the same thing. I was getting out of my car. I put my weight on my left leg, my left knee, as we all would, and I felt pain. She was 260 pounds. I, you know, I don't, you know, I've been gaining weight as I've been getting older. I don't want to pounce on someone for their size and weight, but it's quite apparent. We can't do somatite discriminatory, can we? Well, as I said, I don't want to try to. And you also realize this is being recorded for posterity. This would be your legacy. So you do want to maintain some political correctness. I have a nephew who's a Chicago police officer, and I hope that will counter some of what I may say. They are going to give quite a bit of importance to the outfit that the claimant had on. I think he did, although the commission's decision, you'll see, it says that there is a great amount of evidence in the record to support this. There is no serious dispute in the evidence. The petitioner's left knee injury is causally related. Multiple statements of causal connection are found. They don't tell us what those were, but they do go out of their way to specifically deny anything Dr. Pleyer has said. Based on the claimant's testimony and the arbitrator's observations, it is clear that the protective bulletproof vest, along with the gun belt and accessories, would make getting in and out of a squad car substantially different than an ordinary person in street clothes getting in and out of a personal vehicle. It kind of shoots a hole in your theory that she wasn't doing anything different than what the general public does, doesn't it? Well, again, Your Honor, she was exiting her vehicle. She gave five histories to doctors that she was just exiting her car as one would. In fact, Dr. Pleyer's report is as one would exit one's own car. My goodness, if this were the case, perhaps ironically I would be looking for more business, but we would have an epidemic of officers having injuries. I do know that the Chicago Police Department has changed vehicles recently, but these are standard automobiles. If they were that difficult to get into and out of, why is the police force using them? So all I can say is that she was getting out of a vehicle the same way she would have got out of any vehicle. If her family car was easier to get out of because it was a Ford Explorer, it would have been more difficult to get into it because it's higher. And so be it. Can it turn something so simple? So she's subjected to a risk because of the uniform and the weight of the uniform that the average person isn't, as Justice Hoffman points out, because people don't get in and out of cars with duty belts and 30 pounds of weight on them. Do they? You're saying logically this shouldn't be effective, but the commission found that it was. Why should we substitute our judgment for the commission based on your analysis of the real world, your personal analysis of the real world? Oh, I'm sure that my – I'm relatively confident in my personal analysis of the real world because, again, I'm relying on what the Petitioner said when she went to five doctors. She was just getting out of her vehicle. She put her weight on her left leg, and she felt pain. Well, can't we affirm on any basis in the record? Can't we say the arbitrator viewed the claimant, viewed the duty belt, considered her weight the weight of the duty belt, and found that there was a causal connection? Why can't it be that simple? If the commission had laid out what the causal connection was, all I have is multiple references. I think there are multiple references. Well, they adopted the arbitrator's decision. That was the arbitrator's decision. That's correct. The arbitrator had considerable detail in talking about the evidence. Well, again, the conclusion that there's a causal connection based on the vest and on the belt, as I said, I don't know, I don't see the Petitioner having claimed that because of these devices she exited awkwardly. She just said it was different than getting into and out of her vehicle. As we point out in our reply brief, the physics of this is the same no matter how we deal with it. One exits a car by putting one's weight on one's left side. This lady was heavy set according to Dr. Cole. Dr. Player said, you're this heavy, you have a valgus deformity, bow legs, this is going to happen to you. We submit that's not an exit. But if there's evidence that she's in and out of the car to a greater extent than that of a member of the general public, does that change the analysis then? Not in my opinion. I'm aware of a case law on that subject, Your Honor. But all I can say is this. This was the first time she exited her vehicle on that day. So getting into and out of her vehicle 40 times a day, as far as I'm concerned, is a non sequitur. It really has nothing to do with why she injured her leg at that time, in that place, and on that day. What had to do was her weight and putting her weight on the left leg, which was compromised. Because you say the record doesn't contain any evidence that the frequency of her getting in and out with all this equipment on during the course of a work day has weakened that member? Oh, it does. Well, there is evidence in the record. Had this happened at the end of the day, Your Honor, if this happened at 5, after she had gotten into and out of her vehicle 40 times, we might not be standing before you. Thank you, Counsel. This was the first time. Thank you. Counsel, please. Good morning, Your Honors. Craig Milkey on behalf of Lisa Carter, Petitioner Appellee. I'll try to be brief. I know Mark. I love Mark. I don't really understand his view of this record. There is ample evidence of several independent reasons why this is a compensable claim. The petitioner testifies that because of her protective vest, gun belt, nightstick, radio, she's a Christmas tree of police equipment. She says point blank, it's more difficult to get out of my car. How do I do it differently? I twist and turn at the same time. That's in the record at C-7172. She also says that on this particular incident, how did I get out of the car? As I put my foot down, you have to obviously with all this gear on, you have to twist and move. That's at record C-7374. Can I ask a question? Sure. Doesn't everybody twist and do the same thing when they get out of the car? I don't believe so, not with all this junk she's got on her waist. I can't imagine getting out of a car that you don't twist. Personally, I notice a difference the way I get in and out of a car, whether it's summertime and I'm wearing a T-shirt or it's wintertime and I've got a thick coat on. These police officers, I don't understand how they can even sit down and be comfortable with all this stuff that they have to wear around their waist, and then they have this protective vest on, which is somewhat flexible material. It's not like wearing a coat of armor, but it's a heavy, thick material. You move differently. You move more stiffly if you're a police officer. It's almost like having several of your lower vertebrae fused in place because you can't twist around as easily with all this stuff on. But then Dr. Cole also says she did twist and turn. She's trying to twist and turn. She said she was trying to? You have to twist and move as you get out, yes. I'm trying to imagine how that's different than what a normal person does. I know I twist and turn when I get out of the car. Sure, you do, but you don't have a service revolver on your left hip that's going to put that left hip in a different position. I assume you wear a belt, but you probably don't wear a two-inch thick heavy leather belt that's going to restrict the motion in the waist. It's these things that make it differently, and then Dr. Cole puts it all together and says it's the twisting and getting out of the car that is the cause of the incident. But that's just one reason, so let's put that aside. The one that Mr. Matrenga himself admits, that Dr. Player admits, it's putting the weight on the knee that caused the knee to pop that caused the injury. Yes, this woman weighs 260 pounds, but her service belt with all this stuff on it and her vest weighs an additional 30 pounds. So if the straw that broke the camel's back is a compensable injury, then the 30 pounds of police gear, that adds 10 percent to her body weight, and it's the weight that causes this incident. And so the employer must take the claimant as? Obviously. So we do have some medical testimony that that additional weight caused that. Well, the medical testimony is that weight caused was one of the causes. The weight placed on the knee was one of the causes of the injury to the knee. But we don't know whether it's her weight and the tipping point is the weight of the paraphernalia she's wearing. We don't know anything about that, do we? We certainly didn't get to that fine of a point in any of the testimony. Okay. I'm not aware of any decisions one way or the other that ever get to those absolute fine points. The fact of the matter is it was one of the causes was the weight, and part of that weight was the employer-mandated gear. And it's not an insignificant amount of it. I mean, Mr. Matrenga points out there's other appellate cases that indicate a police officer's belt might only be 10 pounds. Maybe that's true for other departments, but here the belt is not only the service weapon and other gear, it's also a radio, and then it's also this vest. So there's no disputed evidence that it's 30 pounds? Right. And that makes perfect sense to me based on, I mean, the vest that these officers wear is relatively thick. It's relatively bulky. And I think that vest alone probably weighs a good 10 pounds. And the service revolver weighs several pounds. Well, but there's no dispute. It's 30 pounds. Right. If the evidence is weight caused this, and if 10 percent or really more than 10 percent of this woman's weight that she's putting on that knee is the employer-mandated equipment, I think that's the causal connection we need. We also have, you know, maybe at some point in time, 20 years ago, a Ford Crown Vic was the car that people drove on the street. But at the time of this accident, the only people that drove Crown Vics were police officers. And this woman's personal car. What evidence in the record is that? Pardon me? Where is that, that the only people who drive Crown Vics are police officers? I would say that you can almost take judicial notice of that, Your Honor. What if one of the justices was driving a Crown Vic? Pardon? What if one of the justices drove a Crown Vic? It's possible. It's the same as a Mercury. And they still made them as of, I think, this year or last year. I was going to say two years ago. But the Crown Vic, without a doubt, is the number one police car out there. And the point I was going to make, though, is the woman has a Ford Explorer, has her own vehicle. And it's like, especially if you're a heavyset person, getting on and off a higher seat is easier for you than getting in and out of, whether it's a Crown Vic where you're sitting lower. Are we getting close to these jailer risk cases in Southern Illinois? The officer who's in a Crown Vic is getting out. I'd be happy to debate that one with you because I think. . . I don't know that Aurora is Southern Illinois, but let's not get too far afield here. But the point is there are multiple factors here that make what she was doing unique. And at the bottom, at the end of the day, Your Honor, just like in the Margaretville case, that case could have been decided either way. And either way would have been supported by the manifest weight of the evidence. This case, admittedly, could have been decided either way. If the arbitrator and the commission buy, book, line, and sink her into Dr. Player's report, they could easily have denied compensation here. But, you know, Dr. Player says she told me she got out of the car as a normal person would. I'm not real sure what that means. She was not responding to an emergency call. She was not rushing out of the vehicle. But that's not inconsistent with her testimony that she was twisting and turning due to the bulky stuff that she was wearing. Similarly, all the histories for the medical providers are perfectly consistent. I mean, she doesn't want to say, I was getting out of a Crown Vic, but that doesn't mean she didn't get out of a Crown Vic or that the medical histories are not consistent in that regard. So at the end of the day, there is ample evidence in the record to support the arbitrator and the commission's decision. And I would ask that the commission be affirmed.  MR. GARRETT. If I may, just one point I would like to emphasize on the causal connection opinion of Dr. Cole. His ‑‑ I believe I started to answer that question, but then ‑‑ You got confused by the Crown Vic. Probably. Yes, I did. I'm still trying to sort through that. And I'll get to that. But I think I may have confused myself on that subject and gone off on a tangent. However, Dr. Cole said there were two reasons for his opinion that it was work‑related. In the state that there's a causal connection, it was work‑related. One, an absence of preexisting symptoms, and two, the mechanism of injury. At the time he said that, there was no mention of twisting. The only history he had was her just exiting the vehicle. The reference to twisting came several months later in his records. Where that came from, I don't know. Maybe he just assumed it. But at the time he said, I think it's work‑related, he said two things. One, absence of preexisting symptoms, and two, a mechanism of the injury, whatever that was. All he knew about the mechanism in terms of his own history was that she was exiting the vehicle and she felt pain. If he had the other medical records, then he would have learned from those fundamentally the same thing. Well, there were preexisting symptoms. She told Dr. Player she had had crepitation in that knee. In fact, in both knees. There's no doubt that she's got problems in both knees. And she had had that previously. Why Dr. Cole didn't know that, I don't know. So that's the doctor's opinion, and I truly don't know what it's based on in terms of, or what its effect can be in terms of a causal connection, because it's fundamentally flawed. At best, it's flawed. So I wanted to make that particular point, and no other, except that until very recently I did own a Mercury Marquis. Thank you. Thank you, counsel. The court will take the matter under advisory for disposition. Standard recess until about ‑‑